**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:

                                       **Chapter 7**

**YOGA SMOGA, INC.,**

                                       **Case No. 16-13538 (MEW)**

                          **Debtor.**
-----------------------------------------------------------x

## DECISION REGARDING FINAL FEE APPLICATIONS

This bankruptcy case began as an involuntary chapter 7 petition that was superseded by a voluntary chapter 11 filing on December 19, 2016. After approximately ten months of operations the Debtor moved to convert its case to a liquidation case under chapter 7. An Order converting the case was entered on November 7, 2017 [ECF No. 197].

Before the Court are the final fee applications of the following professionals for work they did during the chapter 11 case:

| Firm | Fees Sought | Expenses sought |
|---|---|---|
| Meyer, Suozzi, English & Klein (Counsel to Debtor) | $566,372.22 (of which $472,700.63 is unpaid) | $14,225.59 (of which $3,015.13 is unpaid) |
| Joseph A. Broderick, P.C. (Accountant for Debtor) | $106,185 (all unpaid) | $135.38 (all unpaid) |
| Klestadt Winters Jureller Southard & Stevens, LLP (Counsel to Official Committee of Unsecured Creditors) | $89,626.00 (all unpaid) | $560.81 (all unpaid) |
| CBIZ Accounting, Tax & Advisory of New York, LLC (Financial advisor to Official Committee of Unsecured Creditors) | $70,774.70 (all unpaid) | $41.10 (all unpaid) |

One objection has been filed: by Rishi Bali, a founder and former chief executive officer of the Debtor who continued to act as a director of the Debtor and who also acted as a lender under an

1

approved debtor-in-possession financing agreement.  Mr. Bali contends that "the detailed breakdown of the tasks performed by each professional shows that the fees filed by all the professionals are highly inflated" and also are in excess of the total $562,000 budget estimate that was provided earlier in the case.  Objection, at p. 4 [ECF No. 248].  The budget referenced by Mr. Bali was not provided to the Court.  Mr. Bali further contended that an unnamed "third party professional" had allegedly reviewed the fee applications and determined that the charges were inflated (*id*. at 5), though no details of that review were provided with Mr. Bali's objection.  Mr. Bali also repeated certain objections that the Official Committee of Unsecured Creditors had made with respect to prior interim applications [ECF Nos. 168, 169], though the Committee itself agreed to defer those objections at the time of the interim applications and did not pursue the objections when the final applications were filed.

The final applications came on for hearing on May 17, 2018.  The parties agreed that Mr. Bali, as a DIP Lender, is a beneficiary of liens and security interests in the Debtor's assets, and that the chapter 11 professionals are the beneficiaries of an approved "carve-out" to the liens, security interests and rights granted under the DIP financings.  The parties also agreed that the effect of the carve-out is that the allowed chapter 11 professional fees must be paid by the chapter 7 trustee before any money may be repaid to the DIP Lenders.  The chapter 7 trustee provided information about possible recoveries that suggested that even if the allowed chapter 11 professional fees are only a small fraction of the requested amounts they would likely consume all of the available funds, leaving nothing for the DIP Lenders.  Proceedings since that date (including asset sales) strongly suggest that the DIP Lenders would receive nothing unless the Court were to make vast reductions to the amounts the professionals seek.  Although the Court questioned whether it made sense to proceed with the objections until there was more clarity as

2

to the funds that would be available from the chapter 7 liquidation, the parties nevertheless insisted that the pending objections be resolved and that the professionals' respective claims be fixed.

## **The Governing Standards**

The fee applications before the Court are governed by section 330 of the Bankruptcy Code, which contemplates the allowance of "reasonable compensation for actual, necessary services" and reimbursement of "actual, necessary expenses." 11 U.S.C. § 330(a)(1). The statute makes clear that the Court may "award compensation that is less than the amount of compensation that is requested." *Id*. § 330(a)(2). The Court is to take into account "all relevant factors" in determining a reasonable compensation amount, including:

>   (A)   the time spent on such services;
>
>   (B)   the rates charged for such services;
>
>   (C)   whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
>   (D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
>   (E)   with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
>   (F)   whether the compensation is reasonable based on the customary compensation charged by similarly skilled practitioners in cases other than cases under this title.

*Id.* § 330(a)(3). A Court "shall not allow" compensation for "unnecessary duplication of service," or for services that were not "reasonably likely to benefit the debtor's estate," or for services that were not "necessary to the administration of the case." *Id*. § 330(a)(4).

The factors listed in section 330 are not exclusive; a court has wide discretion in determining the amount of reasonable compensation. *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM)*, 210 B.R. 19, 23 (2d Cir. BAP 1997). Among other things, a court may consider the results that were obtained by counsel, and the quality of the advice and services that were provided. *In re Parkview Care & Rehab. Ctr., Inc.,* No. 08-71867-DTE, 2010 WL 3517069, at *4 (Bankr. E.D.N.Y. Sept. 7, 2010). Professionals are not guarantors of success, and they are entitled to reasonable compensation for reasonable services, even if things do not turn out so well as the client had hoped. *In re JLM*, 210 B.R. at 24; *see also In re Keene Corp.*, 205 B.R. 690, 696 (Bankr. S.D.N.Y.1997) (noting that the test applied is not based on hindsight, but rather is objective and a court considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances"). On the other hand, attorneys and other professionals have a professional obligation to weigh the potential costs of their services against the likely benefits, and should avoid tasks whose costs outweigh the likely benefits. *In re Keene Corp.*, 205 B.R. at 696 (a reasonable attorney "must weigh the likely benefit to the creditors against the likely cost"); *see also In re Angelika Films 57th Inc.*, 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998) ("[a]n attorney should only proceed with a legal service if the potential benefit of the service, which takes into consideration the chances of success, outweighs the costs).

## **The Pending Applications**

No challenge has been made to the competence and qualifications of the professionals. Similarly, no challenge has been made to the hourly rates that they charged, which in any event had been disclosed and approved in advance and were known to all parties in interest at the time the retentions of the professionals were approved. Instead, Mr. Bali has challenged the sizes of the bills that the professionals have submitted. In order to consider this objection the Court has

4

reviewed the time entries and supporting information submitted by the professionals in support of their final applications. The Court's review is further informed by the Court's own familiarity with the issues that were raised in these proceedings and with the work that was required.

**1.      The Meyer, Suozzi Firm**

Meyer, Suozzi was principal counsel to Yoga Smoga. It filed two separate fee applications: one on September 8, 2017 [Dkt. No. 152] and the other on April 24, 2018 [Dkt. 240]. In the first application, Meyer Suozzi noted that it had made voluntary reductions for certain services and had waived fees for certain services (resulting in more than $48,000 of fees that had been incurred but for which Meyer, Suozzi was not seeking payment), and that it had then made an additional $17,353.78 of reductions at Yoga Smoga's request. *See* Summary of First Interim Fee Application of Meyer, Suozzi, English & Klein, P.C. as Counsel for the Debtor and Debtor-in-Possession [Dkt. No. 152] at 2, n. 1 and Exhibit F.

Daily time entries were submitted in support of the Meyer, Suozzi applications. They show that Meyer, Suozzi performed necessary services in each of the following areas, among others:

- It assisted the debtor in preparing necessary schedules of assets and liabilities, the required statement of financial affairs and a creditor list, and provided advice regarding the same;

- It successfully opposed an early motion to convert the chapter 11 case to a case under chapter 7 of the Bankruptcy Code;

- It responded to inquiries from the United States Trustee, coordinated the debtor's appearance at an interview and represented the debtor at meetings of creditors under section 341 of the Bankruptcy Code;

5

- It gave advice to the debtor regarding the requirements of the US Trustee Operating Guidelines;

- It prepared and argued motions seeking approval of debtor-in possession financing, including the preparation of supporting schedules, and responded to objections and to questions about the same;

- It prepared and argued motions seeking authority to pay pre-petition claims of employees, continuations of customer programs, and declarations in support of the same, and responded to questions by the United States Trustee regarding the same;

- It provided advice and assistance in dealing with certain critical vendors who held inventory and prepared motions for approval of agreements with them;

- It assisted the debtor in providing necessary notices to landlords as to whether the debtor desired to close certain locations or to keep them open, prepared motions to reject leases that were not needed, assisted in negotiations with landlords, provided advice as to the calculation of permissible lease rejection claims under section 502(b)(6) of the Bankruptcy Code, and negotiated settlement stipulations with landlords regarding claims arising from lease rejections;

- It assisted in negotiations with utility companies;

- It responded to information requests from the Official Committee of Unsecured Creditors and negotiated confidentiality terms with the Committee;

- It filed required motions for the retention of professionals, maintenance of bank accounts and cash management practices;

- It prepared motions for the sale of certain assets and for the abandonment of certain property;

6

- It prepared and filed a motion for approval of a bar date for the submission of claims;

- It assisted the debtor in communicating with litigants and other creditors about the effect of the automatic stay;

- It prepared and filed papers seeking retention of special litigation counsel for a specific litigation the debtor wished to pursue;

- It reviewed lists of payments made during the 90-day "preference" period and provided advice about potential preference claims;

- It assisted in handling notices of cancellations of credit card agreements;

- It negotiated with creditors (including banks and taxing authorities) about their claims; and

- It worked on a draft disclosure statement and plan of reorganization.

The time entries that were submitted with the applications make for approximately 120 pages of truly mind-numbing reading. Like all time records, they are not perfect, but they are extremely detailed and clear, and no particular time entry has been identified as one for which further explanation should be required. I found no indications that work was done that was unnecessary, or that excessive time was spent.

Mr. Bali has complained that the fee applications allegedly show "[m]ultiple tasks performed simultaneously by two senior lawyers each charging $500/hour for a total of 440 hours each." It is true that two senior lawyers were involved, but that is hardly a surprising fact in a chapter 11 bankruptcy case. I did not find any over-staffing and did not identify any duplication of work, and other than the conclusory accusation Mr. Bali has not identified any.

Mr. Bali has also complained about total fees that have been categorized as "litigation" expenses, and has argued that the majority of the litigation tasks "were performed, charged &

paid for prior to the Chapter 11 filing" and that litigation tasks "were done by contingency litigation counsel" and not by Meyer, Suozzi. However, the time entries show significant legal work in connection with litigation over motions to convert the case to a liquidation proceeding under chapter 7 and/or to appoint a chapter 11 trustee. Those are motions for which Mr. Bali himself wanted a vigorous opposition. Meyer, Suozzi also handled litigation over a Hawaii mechanic's lien. It is true that contingency fee counsel ultimately was hired to pursue other potential litigation against former directors, but prior to that time it was Meyer, Suozzi who consulted with the Debtor's representatives as to whether there were claims that might be pursued. Meyer, Suozzi also assisted the Debtor in identifying contingency fee counsel, negotiating the terms of the retention, and negotiating with the Office of the United States Trustee regarding those terms, all of which work was categorized as "general litigation" work in the fee applications. I found nothing excessive or improper in that work.

Mr. Bali has also questioned $38,329 of fees charged under the category of "asset disposition," but his objection seems to be that the assets did not turn out to be worth as much as everyone would have liked. The "asset disposition" services in this case included: the identification of leases to be rejected, and the filing of motions to reject the same; negotiations with landlords over the terms of such rejections; and determining which items of furniture and equipment could be salvaged and which should be abandoned, including negotiations with landlords with respect to the same. There were numerous leased locations and there is no question that all of this work was necessary, even if the underlying asset values were disappointing to Mr. Bali.

Mr. Bali has objected to fees that have been categorized as "case administration" and "business operations." The purpose of those categories is to assist the United States Trustee and

8

other parties in reviewing applications. They are standard categories, but they necessarily encompass a vast variety of different kinds of services. Determining whether charges are appropriate requires examination of the time entries and of the specific work that was done, and I found no issues in my review of those items.

Other items challenged by Mr. Bali similarly seem to be primarily based on the size of the item relative to his personal assessments of what was accomplished. For example, he has complained about time spent on a plan and disclosure statement that never reached the point of being filed (about $83,629). However, there is no indication that the work was excessive, or that it was contrary to the desires of the Debtor and of Mr. Bali himself. The event that led to the conversion of the Debtor's case was Mr. Bali's decision to cut off further debtor-in-possession funding. He had the right to do so, but that decision did not suddenly mean that the attorneys should not be paid for the work they had already done in pursuing a possible plan and disclosure statement.

Similarly, Mr. Bali has complained about time spent on the preparation of DIP financing papers (which included not only the preparation of the papers but litigation over objections to the same). He contends that the fees ($67,028) were high in relation to the amount of the loan ($562,000), but there were actually several iterations of the proposed DIP funding, beginning with a $362,000 loan provided by the Debtors' two founders (including Mr. Bali) and followed by a supplemental $200,000 financing from nine investors. The latter financing raised intercreditor issues among the various DIP lenders that required additional negotiation and documentation. There also was litigation that had to be handled as a result of objections to the financing proposals, and the litigation required work regardless of whether the size of the DIP was modest. In context, the time spent on DIP financing matters was appropriate.

Mr. Bali's objection also targeted time spent on fee applications and retention applications, but no specific issue was identified. The Bankruptcy Code and applicable guidelines require lawyers to submit extremely detailed time records, plus breakdowns of time spent into various pre-defined categories, plus explanations and justifications of the time spent on each category of tasks. Lawyers routinely are compensated for the time spent in preparing such submissions, and the amounts sought in this case are well in line with standard practices.

Perhaps a result-oriented and even more detailed nit-picking might find some specific time entries that could be questioned, but Mr. Bali did not identify any. Furthermore, Meyer, Suozzi has already agreed to substantial fee reductions. There simply is no basis in the record, or in my review of the time entries, to require further reductions.

**2.    Joseph A. Broderick, P.C.**

Only one complaint has been made about the work of Mr. Broderick: namely, Mr. Bali thinks that the work was duplicative of work also performed by the final advisor to the Official Committee of Unsecured Creditors, presumably because both advisors' time records showed time spent with respect to certain cash flow reports. The truth is that Mr. Broderick's time records show that he provided a host of accounting and financial services, only a relatively small part of which consisted of assistance the preparation of cash flow reports. We did not compile an exact tally, but the time entries that relate specifically to cash flow reports show that roughly 90 hours were spent reviewing, preparing and engaging in communications about more than 20 separate cash flow reports. That amount of time and effort is entirely appropriate.

The separate objection regarding work by the Committee's financial advisor is discussed below.

3. **Klestadt Winters Jureller Southard & Stevens, LLP**

The Klestadt firm acted as primary counsel to the Official Committee of Unsecured Creditors. Mr. Bali has criticized the time spent on "case administration" and in general asks the Court to conduct an unguided search through the time records of instances of alleged duplication of effort. He has also criticized the time spent on the Klestadt firm's own retention and fee applications (a total of $9,610.00). For the most part I find Mr. Bali's complaints to be without merit. I did not see evidence of unnecessary duplication of work. However, the amount sought for the preparation of retention applications and one interim fee application ($9,610) is very high in relation to the total services that were provided. Another $12,919.50 was attributed to the review of other professionals' fee applications and the filing of objections to the same. Presumably the Committee wanted the Klestadt firm to take an aggressive position on other professionals' fees. On the whole, though, the Court finds that the objections were overdone and not well-supported, and not of sufficient value to support the time attributed to them.

I find that an $8,000 reduction in the Klestadt fee application is an appropriate adjustment to compensative for the foregoing matters.

4. **CBIZ Accounting, Tax & Advisory of New York,. LLC**

CBIZ was the financial advisor to the Official Committee of Unsecured Creditors. Mr. Bali believes it was duplicative for CBIZ to do any work that involved cash flow reports. However, CBIZ needed to review those reports (and other information about cash flows) in order to provide analysis and advice to the Committee regarding the Debtor's business prospects and value, as well as the propriety of the proposed debtor-in-possession financing. I saw nothing in the time entries that suggests that any of the work that CBIZ did with respect to cash flow information was inappropriate or excessive.

11

On the other hand, the total compensation that CBIZ seeks is not much less than the amount sought by the Debtor's own financial advisor (Mr. Broderick).  Mr. Broderick had substantially more responsibility for actual accounting work than did CBIZ.  The overall impression that the Court has – both from reviewing the detailed time records and from its supervision of the case itself – is that the financial advisor to the Committee was a bit overly exuberant in the amount of review and analysis that it did in relation to the size of this case and the work already done by the Debtor's own professionals.  I find that a $6,000 reduction in the CBIZ application is an appropriate adjustment to compensate for this.

Counsel to the Debtor is directed to submit a form of order that reflects the foregoing rulings.

Dated:   New York, New York
         February 5, 2019

                                         **s/Michael E. Wiles**
                                         HONORABLE MICHAEL E. WILES
                                         UNITED STATES BANKRUPTCY JUDGE